**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

TRILOGY MARKETING, INC.,

     Plaintiff,

v.                                     Case No. 12-13967

MEMSIC, INC.,

     Defendant.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

On September 1, 2007 Trilogy Marketing, Inc., ("Trilogy") and Memsic, Inc.,

("Memsic") entered into a contract ("the Contract") which governed Trilogy's sales

representation agreement with Memsic.  Trilogy claims that, in violation of the Contract's

terms, Memsic unilaterally reduced commissions that were due to Trilogy.  Trilogy

moved for summary judgment, seeking unpaid commissions from August 2011 to

February 2013 for Memsic's worldwide sales of four component accelerometers that

Trilogy alleges were a product of its sales representation of Memsic.  The matter is fully

briefed, and no hearing is needed.  *See* E.D. Mich. LR 7.1(f)(2).  For the following

reasons, Trilogy's motion for summary judgment will be granted in part and denied in

part.

## I.  BACKGROUND

### A.  The Contract's Provisions

Trilogy is a sales representation firm; Memsic is a manufacturer of automobile

parts.  On September 1, 2007, the parties agreed that Trilogy would be Memsic's "sole

and exclusive Representative" in a "Territory" that included: "Michigan, Indiana, Ohio, Kentucky and western Pennsylvania[.]" (Contract, at ¶ 1, Pg. ID# 281.) The Contract's duration was for one year, with an automatic year-to-year renewal after the first year. (Contract, at ¶ 15, Pg. ID# 285.) Either party was able to terminate the Contract by providing the other party with written notice thirty days in advance. (*Id.*) Trilogy's "general responsibilities" included "diligently and faithfully work[ing] to design [Memsic's] products into products that will go into volume production, [and] solicit[ing] orders for [Memsic's] products." (Contract, at ¶ 2, Pg. ID# 281.) In exchange for these services, Memsic agreed to pay Trilogy a sales commission for sales conducted in Trilogy's territory. (Contract, at ¶ 11(a), Pg. ID# 283.) Specifically, the Contract stated that Trilogy:

> shall be deemed to have 'participated in the consummation of such sale' if [Trilogy] shall have performed certain services on behalf of [Memsic] in connection with a sale, without which services such sale would not have been consummated including more than one of the following: the introduction of the business opportunity to [Memsic] working with engineering to design product in, solicitation of the customer, negotiation of the agreement and such other services necessary to effect a purchase order from or a purchase agreement with the customer.

(Contract, at ¶ 11(b)(ii), Pg. ID# 283.) Memsic reserved the right to "periodically change the rate of commission," but the Contract stated that it was "[Memsic's] policy to maintain all commission rates for the period of this agreement and any changes are to be made at the time of renewal." (Contract, at ¶ 11(c)(iv), Pg. ID# 284.)

This general policy was subject to an exception for "windfall or blue bird activity." "Windfall" sales are defined as "[s]ales, which in [the] opinion of [Memsic] result from circumstances beyond the control and cognizance of [Trilogy.]" "Blue bird activity" is not

defined.  (Contract, at ¶ 11(d), Pg. ID# 284.)  In the case of "windfall or blue bird

activity," the commission was to be negotiated by both parties.  (*Id.*)  Memsic would

provide a written sixty-day notification of a change in commission to Trilogy, and Trilogy

would be asked to either accept or reject the proposal.  (Contract, at ¶ 11(c)(iv), Pg. ID#

284.)  Trilogy agreed to bring any disputes or questions regarding the calculation of

commissions to Memsic's attention within six months after shipment to the customer,

and Memsic agreed to pay all earned commissions forty-five days after the month of

shipment.  (Contract, at ¶¶ 11(g), 13, Pg. ID# 284–85.)  In the event the Contract

terminated, Memsic agreed to pay Trilogy "all sales commissions due on all billings . . .

whether contracted through [Trilogy] or directly with [Memsic] for a period of 180 days."

(Contract, at ¶ 17(a), Pg. ID# 285.).  The parties agreed that "[t]his Agreement shall not

be modified except by written amendment signed by an officer of [Memsic] and

authorized employees of [Trilogy]."  (Contract, at ¶ 26, Pg. ID# 287.)

## B.  The "Design In" and PPAP Process

As stated above, the Contract entitles Trilogy to commissions for products which

are "designed in" to products for customers in Trilogy's territory.  (Contract, at ¶ 11(a),

Pg. ID# 283.)  A part is considered to be "designed in" to a product when the part

becomes a specified part for use in a customer's assembled component.[1]  (Bishop Aff.,

Pg. ID# 325; Gabowski Dep., Pg. ID# 299.)  A part becomes the specified part for a

_____

[1]In its counter-statement of material facts, Memsic "neither admits nor denies"
several of the statements in Trilogy's statement of material facts.  However, as directed
in the court's scheduling order for this case, "Any proffered fact in the movant's
Statement of Material Facts that is not specifically contested will, for the purpose of the
motion, be deemed admitted." (Dkt. 13, Pg. ID# 40.)

customer's assembled component once it satisfies the customer's "Production Part Approval Process" ("PPAP"), which is the design and production process ensuring that a given part satisfies the customer's specifications.  (Bishop Aff., Pg. ID# 325.)  Once a part is approved, it is made part of the customer's specifications and it cannot be changed without an alternative part undergoing the approval process, receiving PPAP designation, and being specified as the part for a given assembled component.  (*Id.*)

The parties' dispute revolves around accelerometers manufactured by Memsic and sold to Autoliv, an automotive safety systems manufacturer with offices and personnel in Southfield, Michigan.  (Bishop Aff., Pg. ID# 326.)  Exhibit B to the Contract set Trilogy's commission rate for Autoliv Electronics at two percent of net sales.  (Contract, at Ex. B, Pg. ID# 290.)  Four versions of Memsic's accelerometers, part numbers MXR7250VW, MXP7205VF, MXS7205VW, and MXR7305VF, were incorporated in Vehicle Stability Control Modules ("VCSMs") manufactured by Autoliv.  (Pl.'s Statement of Material Fact, at  ¶ 17, Pg. ID# 244; Def.'s Counter-Statement of Material Fact, at ¶ 17, Pg. ID# 1308–10.)

The parties disagree regarding the level of involvement Trilogy had in "designing in" Memsic's accelerometers into Autoliv's VSCMs.  Trilogy argues that during the period it was Memsic's sales representative, Memsic's sales to Autoliv "more than doubled," that Trilogy "focused a great deal of its efforts" on causing the four accelerometers to be "designed in" to Autoliv's VSCMs, and that the accelerometers were assigned Autoliv part numbers and sold to facilities in North America, Europe, and China.  (Pl.'s Statement of Material Fact, at ¶¶  16–19, Pg. ID# 244–45.)  Trilogy therefore claims that it is entitled to "design in" commissions for the accelerometers

4

designed in to Autoliv VSCMs manufactured in North America, China, and Europe.

Memsic argues that Trilogy did not have a crucial role in obtaining these "design ins," and that its business with Autoliv would not have been materially impacted had Trilogy not been Memsic's sales representative. (Def.'s Counter-Statement of Material Fact, at ¶¶ 16–17, Pg. ID# 1308–10.) Memsic disputes Trilogy's assertion that it is entitled to commissions for sales outside of its Michigan, Indiana, Ohio, Kentucky, and western Pennsylvania territory.

### C. Memsic's Proposed Amendment

In early August 2011, Memsic sent Trilogy a proposed amended agreement. The proposed amended agreement changed paragraph seventeen of the Contract to require that in the event of termination, commissions would be due to Trilogy for 90 days following the termination rather than the 180 days stated in the Contract. (*Compare* Contract ¶ 17(a), Pg. ID# 285, *with* Proposed Amendment ¶ 17(a), Pg. ID# 361.) Further, the proposed amended agreement modified Exhibit B to the Contract to state that "[n]o commission will be paid on Autoliv sales." (Proposed Amendment, at Ex. B, Pg. ID# 365.) The proposed amended agreement appears to have been attached to an email from Memsic to Terry Bishop, the President of Trilogy, which stated:

> Terry,
>
> I have discussed the Autoliv account situation with many parties here at Memsic. After careful consideration, I have decided to make Autoliv a house account and remove it from the contract with Trilogy. I do not believe you would have any argument that all the support for Autoliv is now being handled by Memsic personnel. I hope that we can continue working with Trilogy to develop other opportunities within your current territory.
>
> I have attached a revised rep agreement. Please review this and send me two signed copies at your convenience.

5

I look forward to continuing the long-standing relationship we have with Trilogy.  If you have anything you would like to discuss, please feel free to call me any time.

Best Regards,
Mark Laich
Vice President of Worldwide Sales & Marketing, Components Business
Memsic, Inc.

(Def.'s Ex. 4, Pg. ID# 1417–18.)  Trilogy argues that it rejected the proposed amendment and that Bishop notified Memsic of the rejection.  Trilogy further states that Memsic did not respond to Trilogy's rejection and that the agreement automatically renewed for another one-year term on September 1, 2011.  However, Memsic stopped paying any commissions to Trilogy starting on September 1, 2011, and deflected all inquiries about Memsic's failure to pay by blaming a turnover in personnel as the cause.  (Pl.'s Statement of Material Facts,  ¶¶ 24–28, Pg. ID# 247.)

Memsic tells a different story.  It denies that Trilogy rejected the proposed amendment, and states that Trilogy and Memsic began operating under the change in commission as soon as it was presented to Trilogy.  Memsic argues that it had a right to unilaterally change the commission rate for the Autoliv account, and that it notified Trilogy of its intent to do so in writing, as required by the Contract.  (Def.'s Counter-Statement of Material Facts, ¶¶ 24–28, Pg. ID# 1313–1315.)

## D.  The Contract is Terminated

On July 11, 2012, Memsic sent Trilogy a letter stating:

MEMSIC, Inc. (MEMSIC) will no longer require the services of Trilogy Marketing Inc. (Trilogy) as its sales representative in [the territory] according to Paragraph Fifteen of the Agreement with Representative between MEMSIC and Trilogy dated September 1, 2007.  This termination will be effective as of the date of this letter.

6

> MEMSIC will continue to pay commissions on the accounts where Trilogy is involved in accordance with Paragraph Seventeen of the Agreement with Representative.  All MEMSIC company properties shall be returned prior to final settlement of representative accounts.

(Pg. ID# 369.)  Trilogy argues that the Contract requires 30 days written notice for any termination and that therefore the termination was not effective until August 11, 2012.  (Contract, at ¶ 15, Pg. ID# 285.)  Further, Trilogy argues that the Contract requires that Memsic pay Trilogy all commissions due on sales for 180 days after the termination is effective, leaving Trilogy entitled to commissions though February 11, 2013.  (Contract, at ¶ 17(a), Pg. ID# 285.)

Memsic responds that Trilogy did not perform duties required to service the Autoliv account as required by the Contract, and in any event, Memsic unilaterally changed the commission rate for the Autoliv account to 0% by providing Trilogy with written notice of its intent to do so in August 2011.  Memsic argues that the parties operated under this reduced commission for several months, and that Trilogy is not entitled to commissions for any Autoliv sales from August 2011 to the termination date, let alone commissions for sales conducted outside of its territory.

## II.  STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

7

The movant has the initial burden of showing the absence of a genuine dispute as to a material fact. *Celotex Corp. V. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant, who must put forth enough evidence to show that there exists "a genuine issue for trial." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Matsushita v. Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Summary judgment, therefore, is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

Because this case is brought under the court's diversity jurisdiction, the choice-of-law rules of the court's forum state, Michigan, govern the determination whether to enforce the Contract's selection of Massachusetts law. *Wallace Hardware Co., Inc. v. Abrams*, 223 F.3d 382, 391 (6th Cir. 2000). "Michigan's public policy favors the enforcement of contractual . . . choice-of-law provisions." *Turcheck v. Amerifund Financial, Inc.*, 725 N.W.2d 684, 688 (Mich. Ct. App. 2006). The parties' choice of law will be applied unless the chosen state has no substantial relationship to the parties or the transaction, or there is no reasonable basis for choosing that state's law. *Hudson v. Mathers*, 770 N.W.2d 883, 887 (Mich. Ct. App. 2009). Neither party argues that Massachusetts law should not apply, and Memsic's principal place of business is in Massachusetts, thereby providing a substantial relationship to the parties. Accordingly, the court will apply Massachusetts law to this dispute.

## III.  DISCUSSION

Trilogy moves for summary judgment on two of its claims:  breach of contract and

8

violation of the Massachusetts's Sales Representative Act.  Mass. Gen. Laws ch. 104, § 9.  The court will consider each claim in turn.

## A.  Breach of Contract

### 1.  *Unilateral Modification*

The threshold question for Trilogy's breach of contract claim is whether Memsic had the ability to unilaterally modify the commission for the Autoliv account from 2% to 0% in August 2011.  If the Contract permitted Memsic to unilaterally modify the commission due to Trilogy, Trilogy's claim for breach of contract must fail because Trilogy would not have been owed commission for any Autoliv sales after August 2011. If the Contract did not permit Memsic to unilaterally modify the commission rate, Trilogy is entitled to unpaid commissions from August 2011 to February 2013, 180 days after the Contract was terminated by Memsic.

Under Massachusetts law, "[t]he words of a contract must be considered in the context of the entire contract rather than in isolation[,]" and "[w]hen the words of a contract are clear, they must be construed in their usual and ordinary sense."  *Gen. Convention of New Jerusalem in the United States of America, Inc. v. MacKenzie*, 874 N.E.2d 1084, 1087 (Mass. 2007).  Determining whether a contract is ambiguous is a question of law for the court.  *Bank v. Thermo Elemental, Inc.*, 888 N.E.2d 897, 907 (Mass. 2008).

> To answer the ambiguity question, the court must first examine the language of the contract by itself, independent of extrinsic evidence concerning the drafting history or the intention of the parties.  Contract language is ambiguous where the phraseology can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken.

9

*Id.* (internal citations and quotation marks omitted).  Once a contract has been

determined to be ambiguous, "the intent of the parties is a question of fact to be

determined at trial."  *Seaco Ins. Co. v. Barbosa*, 761 N.E.2d 946, 951 (Mass. 2002).

   The Contract states:  "This Agreement shall not be modified except by written

amendment signed by an officer of [Memsic] and authorized employees of [Trilogy]."

(Contract ¶ 26, Pg. ID# 287.)  The crux of the parties' dispute revolves around the

interpretation of paragraph 11(c)(iv) of the Contract:

> [Memsic] reserves the right to periodically change the rate of commission
> covered by this Agreement.  As defined in this agreement, this is an annu[a]l
> contract with provision for automatic renewal.  It is [Memsic's] policy to
> maintain all commission rates for the period of this agreement and any
> changes are to be made at the time of renewal.  However, there may be
> unusual circumstances, such as "windfall or blue bird activity" where an
> exception may be required.  In these unexpected circumstances a change in
> commissions for a specific account may be required and the representative
> will be issued a written sixty (60) day notification of a change.  At this time
> [Trilogy] will [be] asked to either accept or reject the proposal.

(Pg. ID# 284.)  Exhibit A to the Contract provides further clarification in Note 3: "Special

cases such as account exclusions or House Accounts shall be defined in Exhibit 'B' and

special commission rates by account or product shall be defined in new exhibits . . .

when applicable and signed by both parties."  (Pg. ID # 289.)

   Trilogy argues that regardless of when Memsic wishes to modify a commission

under the Contract, it must do so in writing and with Trilogy's written approval.  Trilogy

points to paragraph 26, which states that the Contract may only be modified by written

agreement between the two parties.  Trilogy reads paragraph 11(c)(iv) as stating two

periods during which Memsic could alter the commission covered by the Contract.  The

first of these is at the time of renewal, when Memsic could propose an amendment to

the Contract changing the commission rate on a given account.  The second is mid-
contract year when Memsic may change a commission based on "windfall or blue bird"
activity.  In the first instance, Memsic must follow paragraph 26 and provide a written
amendment signed by both parties.  In the second instance, Memsic must issue a
written notification of change sixty days in advance, and Trilogy must either accept or
reject the proposal.  Trilogy asserts that neither alternative happened here; Trilogy
never signed an amendment to the Contract and never provided its approval to a written
notification of commission change because of "windfall or blue bird activity."

Memsic argues that paragraph 11(c)(iv) of the Contract gives it the right to
unilaterally alter Trilogy's commissions without Trilogy's written approval.  It argues that
Trilogy is only given the opportunity to accept or reject a change "in those 'unusual' and
'unexpected' circumstances such as 'windfall or blue bird activity.'"  (Def.'s Response
Br. at 8, Pg. ID# 1326.)  This right does not apply to changes in commissions made at
the end of a Contract year, because Memsic expressly reserved the right to "periodically
change the rate of commission."  (Contract, at ¶ 11(c)(iv); Pg. ID# 284.)

The court finds the Contract to unambiguously require a written amendment
signed by both parties in order to modify the Contract's terms.  (Contract, at ¶ 26, Pg.
ID# 287.)  Memsic makes no attempt to explain why paragraph 26's clear language
should not apply to a modification of Trilogy's commission on the Autoliv account.  The
court agrees with Trilogy that the language Memsic points to in paragraph 11(c)(iv)
governs "windfall or blue bird activity," instances in which Memsic wishes to modify a
commission mid-contract year.  The court notes that even in this scenario, the Contract
states that written notice is required and that Trilogy must either accept or reject the

11

proposal.  (Contract, at ¶ 11(c)(iv), Pg. ID# 284.)  There is no indication that paragraph 26's language does not apply to Memsic's attempted modification of Trilogy's commission for the Autoliv account.  Further, Note 3 to Exhibit A to the Contract states that "[s]pecial cases such as account exclusions or House Accounts . . . shall be defined in Exhibit B . . . and signed by both parties."  (Pg. ID# 289.)  As stated earlier, Exhibit B defines a special commission rate of 2% of net sales for Autoliv.  Memsic's attempt to unilaterally modify Exhibit B to either exclude Autoliv or change the commission rate to 0% (an act having the same effect) violated the plain language of Note 3 to Exhibit A.

Memsic argues that even if the Contract requires either Trilogy's acceptance or rejection of a change in commission, Trilogy did neither and implicitly accepted the change in commission by working for nearly a year under the reduced commission structure.  Memsic cites *Okerman v. VA Software Corp.*, No. 0101825, 16 Mass. L. Rptr. 513, (Mass. Super. Ct., July 9, 2003) (unpublished), *reversed in part*, 871 N.E.2d 1117, as support for this argument.  In *Okerman*, William Okerman was a sales representative for VA Software.  Okerman was paid partly on a commission basis and was subject to a contract that contained a clause stating:

> VA [Software] management reserves the right to expand, reduce or otherwise change the territory and quota assignment as deemed appropriate to align with changes in business conditions. . . . *Changes are at the sole discretion of management judgment*, may be made at any time and may have a retroactive effective date.

*Id.* at *2 (emphasis added).  The contract also stated that the Senior Vice President of VA Software had "the sole and final authority" to modify and interpret the document.  *Id.* VA Software later notified all of its sales employees that it was modifying the compensation plan with retroactive effect.  Okerman signed the modified plan, but

12

claimed that he only did so to acknowledge its receipt. *Id.* at *3. The plan was modified

four more times over the next year and a half, and Okerman signed each modified plan.

Given that Okerman signed numerous contract modifications, the court concluded that

Okerman assented to the modifications and received adequate consideration through

the revised commission structures. *Id.* at *5. The Appeals Court affirmed this holding,

reasoning: "There is no dispute that Okerman knew of the new terms of his

employment, signed each and every contract modification, and continued to work for VA

in accordance with those new terms. As a matter of law, this constituted sufficient

assent to the contract modification . . ." *Okerman v. VA Software Corp.*, 871 N.E.2d

1117, 1125 (Mass. App. Ct. 2007).

     *Okerman* is distinguishable. To begin with, the contract in *Okerman* assigned VA

Software the "sole discretion" to modify the contract. By way of contrast, Memsic's

Contract states that the agreement "shall not be modified except by written amendment

signed by an officer of [Memsic] and authorized employees of [Trilogy]." (Contract ¶ 26,

Pg. ID# 287.) Further, despite language in the *Okerman* contract granting VA Software

the "sole discretion" to modify the terms of the contract, it was undisputed that Okerman

knew of the new terms, and "signed each and every contract modification." *Okerman*,

871 N.E.2d at 1125. Here, the parties agree that Trilogy never signed a written

amendment to the Contract.

     *CoMa Ins. Agency v. Safeco Ins. Co.*, No. 12-4126, 2013 WL 1777251 (6th Cir.

April 25, 2013) (unpublished), is also distinguishable. In *CoMa*, the agency contract at

issue provided that Safeco "may make changes to its commission schedules upon sixty

(60) days prior written notice to [CoMa]." *Id.* at *1. The Sixth Circuit affirmed the district

court's holding that Safeco possessed the unilateral power to modify commissions under the contract, reasoning that the contractual language clearly empowered Safeco to make changes to the commission structure after providing notice to CoMa—no mutual assent was required.  *Id.* at *4.  However, unlike the present case, the contract in *CoMa* contained no language requiring Safeco to seek the agreement of CoMa in the event of a change to the commission schedule.  Here, even if Memsic seeks to modify the commission rate in the middle of a contractual term due to "windfall or bluebird activity" it must seek the agreement of Trilogy.

An email from Mark Laich, Memsic's Vice President of Worldwide Sales & Marketing, to Terry Bishop, President of Trilogy, further supports Trilogy's argument. After explaining that Memsic wished to remove the Autoliv account from the Contract entirely, Laich wrote the following: "I have attached a revised rep agreement.  Please review this and send me two signed copies at your convenience."  (Def.'s Ex. 4, Pg. ID# 1417–18.)  There is no indication in the record that the "revised rep agreement" is any different from the proposed amended agreement discussed earlier.  Simply put, Memsic's own representative asked for Trilogy's consent in modifying the commission, and Memsic has presented no evidence that Trilogy ever signed the proposed amended agreement.

Memsic also argues that Trilogy did not "earn" the Autoliv commissions and that the inclusion of these commissions in the Contract was a "gift" "to show goodwill towards the new relationship."  (Def.'s Br. at 16, Pg. ID# 1334.)  Buyer's remorse does not give Memsic the unilateral right to rewrite the structure of the Contract, absent a provision clearly granting it the power to do so.  Regardless of whether distance has lent

14

clarity to Memsic's decision to agree to a 2% commission for the Autoliv account, the

fact remains that this commission was a part of the Contract, signed and executed by

both parties, and that by its own terms could only be modified by a separate written

amendment, again signed by both parties.  Had Memsic grown displeased with this

arrangement, it was free to seek Trilogy's assent in an amendment to the Contract (as it

attempted) or to unilaterally terminate the Contract after providing thirty days written

notice pursuant to paragraph 15 (as it eventually did).  (Pg. ID# 285.)  Accordingly,

summary judgment is granted in favor of Trilogy on its breach of contract claim.

    2. *Damages*

    Trilogy argues that it is entitled to damages for unpaid commissions resulting

from worldwide sales to Autoliv from August 2011 until February 2013 when the

Contract was terminated; Memsic argues that even if Trilogy is entitled to commissions,

it is not entitled to commissions arising from sales outside of North America.

    Paragraph 11(a) states:

    [Memsic] shall pay a sales commission . . . to [Trilogy] as full compensation
    for services rendered as a full reimbursement for all expenses incurred for all
    the work necessary to design in [Memsic's] products into products for
    *customers located in [Trilogy's] territory*, and for soliciting all orders
    *originating in [Trilogy's] Territory* and accepted by the Company for *shipment
    to the customer in the said Territory*.

(Pg. ID# 283) (emphasis added).  Trilogy's "territory" is defined as "the states of

Michigan, Indiana, Ohio, Kentucky and western Pennsylvania defined by zip codes

150xx through 167xx."  (Contract, at ¶ 1, Pg. ID# 281.)  Paragraph 11(a) therefore

geographically limits Trilogy's commissions to products for customers located in the

"territory" and to orders originating and accepted for shipment to the "territory."  Given

that the territory is limited to Michigan, Indiana, Ohio, Kentucky, and western Pennsylvania, Trilogy is only owed commissions for sales conducted in or shipped to any of those five states.

The parties appear to have had a different practice.  Trilogy and Memsic concede that Trilogy received commissions based on sales conducted throughout North America.  (Pl.'s Statement of Material Facts at ¶ 20, Pg. ID# 245; Def.'s Counter-Statement of Material Facts at ¶ 20, Pg. ID# 1312.)  Trilogy argues that it should have also been receiving commissions for the European and Chinese assembly of VCSMs incorporating Memsic's accelerometers, while Memsic argues that although Trilogy was entitled to commissions for sales in North America, it was not entitled to sales in China and Europe.  But the unambiguous language of paragraph 11(a) does not support *either* position.

Paragraph 11(a) clearly limits Trilogy's sales commissions to "the territory" as defined in paragraph 1.  Paragraph 1 defines "the territory" to include four states, and the western part of Pennsylvania.  It does not mention worldwide sales, nor does it mention sales throughout all of North America.  Neither party has explained why commissions for sales throughout North America are included in the agreement, and the court finds that the plain language of the Contract does not support the parties' interpretation.

"When the words of a contract are clear, they must be construed in their usual and ordinary sense," and "parol evidence [cannot] create an ambiguity when the plain language is unambiguous."  *New Jerusalem*, 874 N.E.2d at 835.  Extrinsic evidence, such as the course of dealing between the parties or the parties' intent, "cannot be used

16

to contradict or change the written terms, but only to remove or to explain the existing

uncertainty or ambiguity."  *Id.* at 836; *see also Bank*, 888 N.E.2d, at 907.  Thus,

although it is puzzling why the parties believe the plain language of the Contract at any

point entitled Trilogy to commissions resulting from sales throughout North America (let

alone, the world), because the court finds the language of the Contract to be

unambiguous regarding the extent of Trilogy's commissions, the parties' course of

dealing and intent cannot be considered.  Accordingly, the court finds that Trilogy is only

entitled to unpaid commissions for sales taking place in or shipments to Trilogy's

"Territory" as defined in the Contract, and nowhere else.

### B.  The Massachusetts Sales Representative Act

Trilogy also seeks summary judgment on its claim that Memsic violated the

Massachusetts Sales Representative Act ("MASA").  Mass. Gen. Laws Ch. 104, § 9

provides:

> A principal who wilfully or knowingly fails to comply with provisions relating
> to the prompt payment of commissions set forth in section eight shall be
> liable to the sales representative in a civil action for the principal amount of
> the commissions owed and for an additional sum up to three times the
> amount of commissions and for reasonable attorney's fees and court costs.

"The terms of the contract between a principal and a sales representative shall

determine when a commission shall be due."  *Id.* at § 8.

Memsic argues that the MASA does not apply because Trilogy is not a "sales

representative" under the statute.  "Sales representative" is defined as "a person other

than an employee, who contracts with a principal to solicit wholesale orders *in the*

*commonwealth* and who is compensated, in whole or in part, by commission[.]"  *Id.* at

§ 7 (emphasis added).

17

In *North East Technical Sales, Inc. v. Barshad*, No. 99-1427-B, 12 Mass. L. Rptr. 97 (Mass. Super. Ct., August 14, 2000) (unpublished), the court analyzed a manufacturer-sales agreement which designated North East as the "exclusive sales representative in New York, Pennsylvania, New Jersey, Delaware, Maryland and Washington, DC." *Id.* at *1. The court held that the MASA did not apply because North East's territory did not include Massachusetts, thereby falling outside the statutory definition of "sales representative" in § 7. As discussed above, Trilogy's territory did not include Massachusetts, and Trilogy advances no reason why the MASA should apply other than an assertion that Trilogy's actual territory included all of North America and "the undisputed facts that Trilogy participated in sales meetings" in Massachusetts. (Pl.'s Reply Br. at 7, Pg. ID# 1503.) Although Trilogy argues that it participated in sales meetings in Massachusetts, its citation to an affidavit from Terry Bishop does not contain any factual support for this claim. Thus, the court denies Trilogy's motion for summary judgment on this claim.[2]

## IV. CONCLUSION

Because the unambiguous terms of the Contract require the parties to agree in writing to an amendment in order modify the Contract, Memsic was not able to

---

[2]To the extent Trilogy argues that the Michigan Sales Representative Act should apply, this argument is without merit. As noted earlier, the contract selects Massachusetts law, and neither party advanced any argument that this choice of law should not be honored by the court. Trilogy appears to have fallen on its argument that the Michigan Sales Representative Act should apply as a last resort following Memsic's argument that the MASA is inapplicable. Because Trilogy did not raise this argument until its reply brief, the argument will not be considered by the court and is deemed waived. *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010) ("We have consistently held . . . that arguments made . . . for the first time in a reply brief are waived.").

18

unilaterally modify the rate of commission due to Trilogy.  However, the unambiguous language of the Contract does not provide Trilogy the right to unpaid commissions resulting from Memsic's sales to Autoliv throughout the world—instead, Trilogy is owed unpaid commissions only for sales taking place in its "territory" as defined by the Contract.  Accordingly,

IT IS ORDERED that summary judgment is GRANTED in favor of Trilogy as to its breach of contract claim.  A briefing schedule will be set by the court to determine the amount of damages due to Trilogy for unpaid commissions resulting from Memsic's sales to Autoliv from August 2011 to February 2013.

IT IS FURTHER ORDERED that summary judgment is DENIED to Trilogy as to Count II of its Complaint.

       s/Robert H. Cleland
      ROBERT H. CLELAND
      UNITED STATES DISTRICT JUDGE

Dated:  November 20, 2013


I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, November 20, 2013, by electronic and/or ordinary mail.

       s/Lisa Wagner
      Case Manager and Deputy Clerk
      (313) 234-5522