**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

TRILOGY MARKETING, INC.,

    Plaintiff,

v.                                    Case No. 12-13967

MEMSIC, INC.,

    Defendant.

                                                 /

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO DAMAGES, GRANTING SUMMARY JUDGMENT TO DEFENDANT ON PLAINTIFF'S STATUTORY SALES COMMISSION CLAIM, AND DISMISSING PLAINTIFF'S CLAIM FOR UNJUST ENRICHMENT**

On November 20, 2013, the court granted summary judgment in favor of Plaintiff Trilogy Marketing, Inc., ("Trilogy") on Trilogy's breach-of-contract claim. (Dkt. # 38, Pg. ID 1671–89.) However, because the parties' briefing centered around a dispute over whether Defendant Memsic, Inc., ("Memsic") could unilaterally modify Trilogy's commission under a sales representation contract ("the Contract"), the court could not determine the amount of damages Memsic owes Trilogy as a result of the breach. Following an unsuccessful settlement conference with a magistrate judge, the parties requested the opportunity to submit supplemental motions for summary judgment focused solely on the amount of commissions owed to Trilogy under the Contract. The matter is fully briefed, and no hearing is needed. E.D. Mich. Local R. 7.1(f)(2). For the following reasons, Trilogy's motion for summary judgment will be denied.

**I. BACKGROUND**

The court extensively discussed the facts in its November 20, 2013, order

granting summary judgment in part to Trilogy, and this discussion is incorporated by reference. (Dkt. # 38, Pg. 1671–77.) Briefly, Trilogy is a sales representation firm, and Memsic is a manufacturer of automobile parts. Trilogy and Memsic entered into a sales representation agreement whereby they agreed that Trilogy would be Memsic's sole and exclusive sales representative for a territory that included Michigan, Indiana, Ohio, Kentucky, and portions of western Pennsylvania. Trilogy agreed to work to "design in"[1] Memsic's automotive parts into products that would go into large volume production, and to solicit orders for Memsic's products.

In return, Memsic agreed to pay Trilogy a sales commission "as full compensation for services rendered as a full reimbursement for all the work necessary to design in [Memsic's] products into products for customers located in [Trilogy's] territory, and for soliciting all orders originating in [Trilogy's] Territory and accepted by [Memsic] for shipment to the customer in the said Territory." (Dkt. # 50-1, Pg. ID 1797.) The Contract defines "sales" as: "any duly authorized and executed purchase order or written purchase agreement, accepted by and binding on the Company to sell, and a customer, other than the Representative, to purchase the Products." (Dkt. # 50-1, Pg. ID 1797.) The Contract further stated that Trilogy:

> shall be deemed to have 'participated in the consummation of such sale' if [Trilogy] shall have performed certain services on behalf of [Memsic] in connection with a sale, without which services such sale would not have been consummated including more than one of the following: the introduction of the business opportunity to [Memsic] working with engineering to design product in, solicitation of the customer, negotiation of the agreement and such other services necessary to effect a purchase order from or a purchase agreement with the customer.

---

[1] As discussed *infra*, this term is left undefined by the Contract.

(*Id.* at Pg. ID 1797.) Four of Memsic's accelerometers were designed into Autoliv Vehicle Stability Control Modules, which were subsequently manufactured in Canada, Europe, and China.

Eventually, Memsic attempted to unilaterally change Trilogy's commission for the Autoliv account to 0%, which the court determined that it did not have the power to do. (Dkt. # 38, Pg. ID 1685.) The court therefore granted summary judgment in favor of Trilogy on its breach-of-contract claim. The court then considered the amount of damages due to Trilogy for the breach. Trilogy argued that it was entitled to unpaid commissions resulting from Memsic's worldwide sales to Autoliv; Memsic argued that Trilogy was not entitled to any commissions for sales outside of North America. (*Id.* at Pg. ID 1686.) However, neither party explained how the plain language of the Contract, which defines Trilogy's territory as Michigan, Indiana, Ohio, Kentucky, and western Pennsylvania, supported a reading of the Contract that would allow Trilogy *either* commissions for sales conducted in all of North America *or* throughout the world. The court therefore declined to determine the amount of damages to which Trilogy was entitled and ordered further briefing on the issue.

## II. STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

The movant has the initial burden of showing the absence of a genuine dispute as to a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant, who must put forth enough evidence to show that there exists "a genuine issue for trial." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Matsushita v. Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Summary judgment, therefore, is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). The court has already determined that it will apply the Contract's choice of Massachusetts law to this dispute. (Dkt. # 38, Pg. ID 1678.)

### III. DISCUSSION

#### A. Damages

Not much has changed since the court's opinion and order granting partial summary judgment to Trilogy. Trilogy still maintains that it is entitled to worldwide commissions on its sales, and Memsic still maintains that it does not owe Trilogy anything. Tellingly, in a joint statement of material facts, the parties are only able to agree on seven undisputed facts. (Dkt. # 44, 1723–24.) The parties agree that they always understood that Autoliv had no manufacturing facilities in Trilogy's territory. The parties further agree that Memsic paid 2% commission to Trilogy on net sales for Memsic product delivered to Autoliv's Canadian facility from September 1, 2007, to July 2011.

This is where the parties' agreement ends. Trilogy argues that Autoliv's purchasing group was located in Southfield, Michigan, and thus within Trilogy's territory. It asserts that all negotiations with Autoliv were held in Southfield, and Autoliv's

Southfield personnel authorized all orders. Thus, Trilogy concludes that the sales originated in Southfield, and are therefore subject to a commission under either paragraph 11(a) of the Contract (because Autoliv's personnel were "located in" the Territory) or paragraph 12 (as a sale originating in the Territory for shipment outside of the Territory). Trilogy further argues that given that Memsic paid commissions to Trilogy on net sales to Autoliv's Canadian facility for over three years, Memsic should be estopped from arguing that the Contract did not entitle it to these commissions. At the very least, Trilogy argues, this course of dealing should establish that Trilogy is entitled to unpaid commissions for products shipped to Autoliv's Canadian facility.

 Memsic disputes that Trilogy is entitled to any unpaid commissions. Regarding Trilogy's argument that it is entitled to commissions under paragraph 11(a), "Memsic denies that Trilogy was successful or responsible for the design in of Memsic's components into Autoliv parts." (Dkt. # 51, Pg. ID 2028.) Thus, Memsic argues, the first portion of paragraph 11(a) of the Contract which states that Memsic will pay a sales commission "as full compensation for services rendered as a full reimbursement for all the work necessary *to design in* [Memsic's] products into products for customers located in [Trilogy's] territory," (*see* Dkt. # 50-1, Pg. ID 1797) is inapplicable because Trilogy did not successfully design in Memsic's products. Instead, Memsic argues that Autoliv was already its customer and that "Memsic was the party that was ultimately successful in having the products designed in to Autoliv's products." (Dkt. # 51, Pg. ID 2028.)

 Under Massachusetts law, "[t]he words of a contract must be considered in the context of the entire contract rather than in isolation[,]" and "[w]hen the words of a contract are clear, they must be construed in their usual and ordinary sense." *Gen.*

5

*Convention of New Jerusalem in the United States of America, Inc. v. MacKenzie*, 874 N.E.2d 1084, 1087 (Mass. 2007). Determining whether a contract is ambiguous is a question of law for the court. *Bank v. Thermo Elemental, Inc.*, 888 N.E.2d 897, 907 (Mass. 2008).

> To answer the ambiguity question, the court must first examine the language of the contract by itself, independent of extrinsic evidence concerning the drafting history or the intention of the parties. Contract language is ambiguous where the phraseology can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken.

*Id.* (internal citations and quotation marks omitted). Extrinsic evidence, such as the course of dealing between the parties or the parties' intent, "cannot be used to contradict or change the written terms, but only to remove or to explain the existing uncertainty or ambiguity." *New Jerusalem*, 874 N.E.2d at 1087; *see also Bank*, 888 N.E.2d, at 907. "It is an elementary rule in the construction of contracts that whenever practicable every word used by the parties shall be given some effect." *Bray v. Hickman*, 161 N.E. 612, 614 (Mass. 1928). "So far as reasonably practicable [a contract] should be given a construction which will make it a rational business instrument and will effectuate what appears to have been the intention of the parties." *Id.* at 613.

As stated in its previous opinion and order, the court finds the compensation provision in paragraph 11(a) unambiguous. The Contract contemplates one of two ways that Trilogy may be entitled to compensation: (1) "for all work necessary to design in [Memsic's] products into products for customers located in [Trilogy's] territory" and (2) "for soliciting all orders originating in the [Trilogy's] Territory and accepted by [Memsic]

6

for shipment to the customer in the said Territory." (Dkt. 50-1, Pg. ID 1797.) Under the first provision of paragraph 11(a), Trilogy must have "design[ed] in" Memsic's products into a product for a customer "located in" Michigan, Indiana, Ohio, Kentucky, or western Pennsylvania.

In this case, the relevant client is Autoliv, and the parties agree that Autoliv has personnel in Southfield, Michigan who negotiated Memsic's annual contracts from "at least" 2007. (Dkt. # 44, Pg. ID 1724.) The term "located in" is not specifically defined in the Contract; however, interpreting the phrase in its "usual and ordinary sense," *New Jerusalem*, 874 N.E.2d at 1087, it is reasonably clear that Autoliv's physical presence in Southfield, Michigan, is enough to locate it in Trilogy's territory. Otherwise, it would make little sense for the parties to have agreed on a special commission rate of 2% for the Autoliv account, given that neither party asserts that Autoliv has any facilities or personnel in Ohio, Indiana, Kentucky, or western Pennsylvania.

This interpretation is confirmed by consideration of the second way that paragraph 11(a) allows Trilogy to earn a commission: "for soliciting all orders *originating* in the Representative's Territory and accepted by the Company *for shipment to the customer in the said Territory*." (Dkt # 50-1, Pg. ID 1797.) Under this second clause, Trilogy could earn commissions for any of the sales activity it conducted in its Territory, so long as Memsic accepted the orders *for shipment to the customer in the Territory*. However, it is undisputed that Autoliv had no manufacturing facilities within Trilogy's Territory, and that the parties understood this fact when they executed the Contract. (Dkt. # 44, Pg. ID 1724.) Thus, under the second clause of 11(a), Trilogy can only earn commissions for products that are also shipped to customers with facilities

7

within its Territory—an impossibility for the Autoliv account. Therefore, an interpretation of paragraph 11(a) that eliminated Trilogy's ability to collect a commission for Autoliv under the first clause of that, for "designing in" products for customers "located in" Trilogy's territory, would effectively deny Trilogy the ability to collect any commission on the Autoliv account. Further, such an interpretation would render the specially negotiated commission rate for the Autoliv account (Dkt. # 50-1, Pg. ID 1804) a nullity as Trilogy would be unable to engage in qualifying activity to earn the special rate. *See Bray*, 161 N.E. at 613–14 ("To construe the agreement as meaning something else, or as failing to express this meaning, would require [the court] to attribute no effect to several words and to treat them as surplusage."). Thus, it would appear that Trilogy is entitled to a 2% commission on worldwide sales to Autoliv during the period of the Contract.

However, a threshold question still exists regarding whether Trilogy "designed in" Memsic's products into Autoliv's products. Memsic denies that Trilogy successfully designed in *any* of Memsic's parts into Autoliv's products. (Dkt. # 52-1, Pg. ID 2067; Dkt. # 52-3, Pg. ID 2087.) For example, James Fennelly, Business Development Manager for Memsic, states via affidavit that:

> Trilogy essentially acted as nothing more than a middle man and note taker that set up teleconferences and meetings and was otherwise sometimes carbon copied on emails. It was not involved substantively in any process that lead toward any design-in wins at Autoliv or during the entire time of its contract with Memsic.

(Dkt. # 52-3, Pg. ID 2087.) Of course, Trilogy disputes this claim, attaching emails that it argues demonstrate that its sales representatives had frequent contact with Autoliv personnel. (Dkt. # 50-1, Pg. ID 1946–91.) Further, Trilogy points to deposition

testimony from its President, Terrence Bishop, who stated that he met with Autoliv personnel "multiple times a week" to work on the design-in process for Memsic's accelerometers. (Dkt. # 50-1, Pg. ID 1849.)

Although clearly a key term of art, the phrase "design in" is not defined in the Contract. Yet the Contract apparently contemplates a broad definition, given that it specifies that the sales commission is "full compensation" for "*all the work necessary* to design in Company's products into products for customers located in Representative's territory."[2] (Dkt. # 50-1, Pg. ID 1797) (emphasis added). Although the parties offer competing ideas about the level to which Trilogy was involved in the successful design in of Memsic's accelerometers into Autoliv's products, they agree that four Memsic accelerometers, part numbers MX7250VW, MXP7205VF, MXS7205VW, and MXR7305VF, were indeed "designed into" Autoliv's products. (Dkt. # 33, Pg. ID 1308–09.) Put another way, although Memsic speaks in terms of degrees, claiming that it was the party "ultimately successful in having the products designed into Autoliv's products," the Contract speaks only of "*necessary*" work, not which party bore primary responsibility for designing in Memsic's products. (Dkt. # 51, Pg. ID 2027.) But again,

---

[2] The closest the Contract comes to listing activities that would constitute "work necessary to design in" products, is in paragraph 11(b)(ii). There, the Contract states that Trilogy shall be deemed to have "participated in the consummation" of a sale if it performed one or more services, "without which services the sale would not have been consummated." (Dkt. # 50-1, Pg. ID 1797.) These services include: "the introduction of the business opportunity to [Memsic], *working with engineering to design product in*, solicitation of the customer, negotiation of the agreement and such other services necessary to effect a purchase order from or a purchase agreement with the customer." (*Id.*) (emphasis added). It is unclear whether this subsection was meant to apply to paragraph 11(a), given that although the phrase "participated in the consummation of such sale" is emphasized and defined, it does not appear to have been used anywhere else in the Contract.

9

the Contract provides no examples of what is considered "necessary" work, thereby rendering the provision ambiguous.

Once a contract has been determined to be ambiguous, "the intent of the parties is a question of fact to be determined at trial." *Seaco Ins. Co. v. Barbosa*, 761 N.E.2d 946, 951 (Mass. 2002). Factors to consider when interpreting ambiguous terms in a contract include: the probable intention of the parties, the contract as a whole, circumstances surrounding the contract, justice, and common sense. *City of Haverhill v. George Brox, Inc.*, 716 N.E.2d 138, 141 (Mass. App. Ct. 1999). Uncertainties in an instrument are normally construed against the drafter, in this case, Memsic. *Seaco*, 761 N.E.2d at 951.

Memsic offers at least some evidence that Trilogy did not complete any "necessary" work to design in Memsic's accelerometers into Autoliv's products. As mentioned above, Fennelly states that Trilogy was "nothing more than a middle man and note taker" and that it was "not involved substantively in any process that lead toward any design-in wins." (Dkt. # 52-3, Pg. ID 2087; *see also* Dkt. # 52-1, Pg. ID 2067.) A reasonable jury, in the light most favorable to Memsic, could construe these statements as establishing that Trilogy did not complete any work "necessary" to design in Memsic's products into Autoliv products, and that Trilogy is therefore not entitled to any commissions for the Autoliv account.[3] *See Sagan*, 342 F.3d at 497. In other

---

[3] The court finds Memsic's arguments in this regard to be less than convincing. As stated in the court's earlier opinion, it appears that Memsic did pay Trilogy commissions for manufacturing orders from Autoliv's Canadian facility. (Dkt. # 38, Pg. ID 16.) Memsic halted these payments after it mistakenly concluded that it had the power to unilaterally alter Trilogy's Autoliv commission from 2 to 0%. Evidence of the parties' intent also appears to support Trilogy—Memsic's former Director of Sales,

words, although Trilogy submits sufficient evidence for a jury to return a verdict in its favor, Memsic's claim that Trilogy did not actually complete any necessary work renders a jury's determination necessary. Accordingly, summary judgment is inappropriate, and Trilogy's motion will be denied.

The court will briefly address the parties' argument that paragraph 12 of the Contract supports each of their respective positions. Paragraph 12 states:

> SPLIT COMMISSIONS—On orders originating in [Trilogy's] Territory for shipment to points outside the Territory, and on orders originating outside the Territory for shipment into the Territory, the Company shall be the sole judge regarding the division of fees and commissions between Representatives for services rendered, or to be rendered, in the securing and servicing of such orders, with the following policy being applicable as shown in Exhibit A.

(Dkt. # 50-1, Pg. ID 1798.) Exhibit A to the Contract sets standard commission and split commission rates, but notes that "special cases . . . shall be defined in Exhibit B." (*Id.* at Pg. ID 1803.) Autoliv appears to have been a "special case" as contemplated in Exhibit A, as Trilogy and Memsic agreed on a special commission rate for Autoliv as "two percent (2%) of net sales" in Exhibit B to the Contract. (*Id.* at Pg. ID 1804.) Trilogy cites paragraph 12 to argue that the Contract plainly contemplates awarding commissions for orders which would originate in Trilogy's Territory, but which would be shipped outside of the Territory, as it specifies a 2% commission for Autoliv as a

---

Stanley Grabowski, states in his affidavit that he agreed that Trilogy would be entitled to worldwide commissions on the Autoliv account, given that sales to Autoliv were deemed to "originate" in Michigan. Trilogy's President confirms this understanding, and neither Niu nor Fenelly were involved in negotiating the Contract. (Dkt. 50-1, Pg. ID 218; see Dkt. # 52-1, Pg. ID 2065; Dkt. # 52-3, Pg. ID 2084.) To the extent that it is ambiguous whether Trilogy completed work "necessary" to design in Memsic's products, the court reiterates that the jury will be instructed to construe this ambiguity *against* Memsic. Lastly, Memsic's argument that it paid Trilogy commissions for work that it did not do as a "gift" and "sign of good faith," strikes the court as improbable, to say the least.

"special case." Memsic argues that paragraph 12 allows it to be the "sole judge" regarding commissions, and that in this case, it exercised its judgment to find that Trilogy was not entitled to any commissions.

Memsic's argument is easily dispensed with, given that the court has already ruled that Memsic did not have the unilateral power to alter Trilogy's commission. (Dkt. # 38, Pg. ID 1679–85.) Further, the court is unconvinced that Paragraph 12 deals with the instant case. Instead, it appears to contemplate a situation where two of Memsic's sales representatives dispute their individual portion of a shared commission that arises out of sales and/or shipments between each of their two, distinct territories. Here, it is undisputed that Trilogy was Memsic's "sole and exclusive" sales representative for the Autoliv account, so Paragraph 12 plainly does not apply.

### B. Statutory Sales Commission Claim

On July 28, 2014, the court issued an order to Trilogy to show cause why summary judgment should not be granted to Memsic on Trilogy's claim for a violation of the statutory sales commission act. *See* Fed. R. Civ. P. 56(f). The court previously determined that Massachusetts law applies to this action, and that because Trilogy was not a "sales representative" under the meaning of the Massachusetts Sales Representative Act ("MASA"), Massachusetts law provided Trilogy with no relief for a violation of MASA. (Dkt. # 38, Pg. ID 1678, 1687–88.)

Trilogy now argues that the court should revisit its determination that Massachusetts law applies to this action, and that the Michigan Sales Representative Act should apply. To be clear, Trilogy is not asking that the court apply Michigan law to the entire Contract—rather, it is asking that the court selectively apply Michigan law to

12

one of its claims, but not the others.

Trilogy bases its argument on paragraph 20 of the Contract:

> GOVERNING LAW — This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Massachusetts or if appropriate, of any foreign jurisdiction encompassing the Territory.

(Dkt. # 50-1, Pg. ID 1800.) Trilogy first argues that this choice of law provision allows the court to apply Massachusetts law and the law of any state within the Territory, and that the application of Massachusetts law need not be exclusive. The court rejects this construction of the Contract, given that the Contract's language includes the conjunction "or," thereby suggesting that the court may apply *either* Massachusetts law, *or* the law of any state in the Territory. And as stated *supra*, the court has already determined that Massachusetts law should apply.

Regardless, the Contract leaves it to the court to make a determination whether to apply the law of one of the several states within the Territory. Michigan's choice-of-law rules govern the determination whether to enforce the Contract's selection of Massachusetts law. *Wallace Hardware Co., Inc. v. Abrams*, 223 F.3d 382, 391 (6th Cir. 2000). "It is undisputed that Michigan's public policy favors the enforcement of contractual . . . choice-of-law provisions." *Turcheck v. Amerifund Fin., Inc.*, 725 N.W.2d 684, 688 (Mich. Ct. App. 2006).

> The parties' choice of law will not be followed if (1) the chosen state has no substantial relationship to the parties or the transaction or (2) there is no reasonable basis for choosing that state's law. Also, the chosen state's law will not be applied when it would be contrary to the fundamental policy of a state that has a materially greater interest then the chosen state in the determination of the particular issue and whose law would be applicable in the absence of an effective choice of law by the parties.

*Hudson v. Mathers*, 770 N.W.2d 883, 887 (Mich. Ct. App. 2009).

Trilogy argues that because Massachusetts limited the application of the MASA to sales representatives who solicit wholesale orders in the commonwealth, *see* Mass. Gen. Laws Ch. 104 § 7, Massachusetts has no state interest in the application of its sales commission act to the solicitation of orders outside of the commonwealth. In contrast, Trilogy argues that Michigan has a strong public policy interest in applying its sales representative statute, citing *Howting-Robinson Assocs., Inc. v. Bryan Custom Plastics*, 65 F. Supp. 2d 610 (E.D. Mich. 1999).

In *Howting-Robinson*, the plaintiff sales representative brought suit against the defendant automotive components manufacturer, alleging a breach of the relevant sales representation agreement, which selected Ohio law to govern the agreement. After a jury found in favor of the plaintiff, the parties entered a stipulation asking the court to decide whether the Michigan Sales Representative Act should apply. The court held that applying Michigan's choice of law principles, it "must" find that Michigan's, rather than Ohio's, sales representative act should apply because Ohio had no substantial relationship to the parties, and because Ohio law "contain[ed] no such protection or provision."[4] *Id.* at 613.

Trilogy attempts to analogize the relationship between the parties in the instant case to that of the parties in *Howting-Robinson*, arguing that in each case the parties

---

[4] Trilogy correctly argues that the *Howting-Robinson* court was mistaken about this second point; Ohio does indeed have a sales representative statute that was in effect at the time *Howting-Robinson* was decided. *See* Ohio Rev. Code § 1335.11. In fact, Ohio's statute is much more punitive than Michigan's, allowing a successful plaintiff to recover attorneys' fees, costs, and *up to three times* the damages owed; Michigan's statute allows such a plaintiff to recover attorneys' fees and costs, but caps the statutory damages at twice the amount of commissions due, or $100,000, whichever is less. *Compare* Ohio Rev. Code § 1335.11(D) *with* Mich. Comp. Laws § 600.2961(5)–(6).

14

have a more substantial relationship to Michigan, than they do to the law of their chosen state. There are two reasons why this argument fails. First, Michigan has a strong public policy preference for the enforcement of contractual choice-of-law provisions. *See Turcheck*, 725 N.W.2d at 688. In the instant case, the parties chose Massachusetts law to apply. Unfortunately for Trilogy, it does not satisfy the statutory requirements of the MASA; if it did, the court would allow its claim to proceed. Plaintiff agreed to the selection of Massachusetts law at its own risk, and buyer's remorse does not give it the ability to argue otherwise. (Dkt. # 55, Pg. ID 2218.)

Second, Trilogy waited initially until its reply brief in support of its original motion for summary judgment, and then for its motion for summary judgment as to damages, to raise its argument that Michigan law should govern (at least part of) the Contract. But in its original motion for summary judgment, Trilogy declined to address the issue and agreed that Massachusetts law governed the Contract.[5] (Dkt. # 26, Pg. ID 265.) Litigants wait until the last moment to raise substantive threshold legal principles at their peril; the court will not reconsider its previous ruling simply because Trilogy has now realized that its interests might be better served under Michigan law. Trilogy had an earlier opportunity to argue that Michigan law should govern the contract, and it chose not to. The issue remains forfeit. (See Dkt. # 55, Pg. ID 2217; Dkt. # 38, Pg. ID 1688.) *See also Automated Solutions Corp. v. Paragon Data Sys.*, Inc., Nos. 13-3025, 13-3058, 2014 WL 2869286, at *14 (6th Cir. June 25, 2014); *Sanborn v. Parker*, 629 F.3d

---

[5] Nor did Trilogy raise the choice-of-law issue in its motion for reconsideration, instead choosing to reassert its argument that it is entitled to commissions for Memsic products shipped throughout North America, an argument expressly reserved for a later date by the court.

15

554, 579 (6th Cir. 2010). Accordingly, the court will grant summary judgment in favor of Memsic on this claim.

### C. Unjust Enrichment Claim

In the above-mentioned order to show case, the court also directed Trilogy to show cause why its claim for unjust enrichment should not be dismissed, given that "an equitable remedy for unjust enrichment is not available to a party with an adequate remedy at law." *Santagate v. Tower*, 833 N.E.2d 171, 176 (Mass. App. Ct. 2005); (*see* Dkt. # 55, Pg. ID 2216–17). The court has already granted summary judgment in favor of Trilogy on its breach-of-contract claim, thus providing it with an adequate remedy at law. In its response to the court's order, Trilogy did not advance any reason why its claim for unjust enrichment should not be dismissed with prejudice. Therefore, the court will dismiss Trilogy's claim for unjust enrichment.

### IV. CONCLUSION

IT IS ORDERED that Trilogy's motion for summary judgment as to damages (Dkt. # 50) is DENIED.

IT IS FURTHER ORDERED that summary judgment is granted in favor of Memsic on Trilogy's statutory sales commission act claim.

IT IS FURTHER ORDERED that Trilogy's claim for unjust enrichment is DISMISSED.

IT IS FURTHER ORDERED that the parties are DIRECTED to appear at **10:30 a.m. on September 10, 2014**, for a conference at which the court will set a trial schedule.

      s/Robert H. Cleland  
      ROBERT H. CLELAND  
      UNITED STATES DISTRICT JUDGE

Dated: August 29, 2014

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, August 29, 2014, by electronic and/or ordinary mail.

      s/Lisa Wagner  
      Case Manager and Deputy Clerk  
      (313) 234-5522